Denise DeBOSE and J.D.B., a minor child, By and Through his parent and next friend, Denise DeBOSE, Plaintiffs–Appellees and Cross–Appellants,

v.

BEAR VALLEY CHURCH OF CHRIST, a Colorado corporation, Defendant–Appellant and Cross–Appellee,

and

Homer Wolfe, Defendant–Appellant.

No. 92CA1929.

Colorado Court of Appeals, Div. III.

Nov. 17, 1994.

As Modified on Denial of Rehearing Jan. 5, 1995.*

Certiorari Pending Jan. 24, 1995 (95SC42).

---

* Davidson, J., would grant petitions of plaintiffs-appellees and cross-appellants.

Holland, Seelen & Pagliuca, Joyce Seelen, Jeffrey S. Pagliuca, Denver, for plaintiffs-appellees and cross-appellants.

Quigley & Bruce, Neil Quigley, Denver, for defendant-appellant and cross-appellee Bear Valley Church of Christ.

Blunk, Johnson & Johnson, James D. Johnson, Sheila E. Barthel, Denver, for defendant-appellant Homer Wolfe.

Opinion by Judge CRISWELL.

The defendants, Homer Wolfe and Bear Valley Church of Christ (Church), appeal from judgments entered on jury verdicts in favor of plaintiffs, Denise DeBose (mother) and J.D.B. (minor), based on findings that both defendants breached a fiduciary duty owed to both plaintiffs and that they were guilty of outrageous conduct with respect to the minor. In addition, the Church was found liable to the minor because of its negligence in hiring and supervising Wolfe, a pastor employed by it. The minor cross-appeals, asserting that the court committed instructional error with respect to this claim of negligence. Although we conclude that the evidence was sufficient to sustain the judgments, we also conclude that the several verdicts upon which the judgment for the minor was based are either duplicative of the damages awarded him or are otherwise inconsistent. In addition, we conclude that the trial court erroneously admitted improper expert testimony and that it committed instructional error. Hence, we reverse and remand the cause for a new trial.

The jury's verdicts were based on incidents that allegedly occurred in pastoral counselling sessions conducted by Wolfe with the minor. Plaintiffs assert that these incidents involved the improper touching of the minor by Wolfe, constituting sexual abuse, which caused the minor and his mother severe emotional injury.

The minor testified that he counseled with Wolfe for several years prior to and immediately after entering middle school. He said that, commencing with the first counseling session, Wolfe would have the minor sit on his lap or sit next to him on a couch. Wolfe would then rub the minor's back and thigh. On occasions, Wolfe would slide the minor's shirt up while rubbing his back, and in several instances, Wolfe would rub the inside of the minor's thigh under his shorts next to his penis, which would be touched. While thus engaged, Wolfe would say to the minor that his father loved him, his mother loved him, God loved him, and Wolfe loved him.

Wolfe, on the other hand, denied having any physical contact with the minor in any of their counseling sessions. However, plaintiffs introduced evidence that in other instances involving other counselees Wolfe had employed massage as a counseling technique. Wolfe admitted doing so; he testified, nevertheless, that he limited his massaging to the back and the lower portions of the counselee's legs. He denied touching any counselee's thighs or genitalia.

Wolfe's testimony was that he never attempted to engage in any therapeutic or secular counseling. Rather, he described his counseling as "Biblical" or "Christian" in origin. He said that, over the years of his counseling, he carefully explained to his counselees that he had "no power to change" their lives, but that he could only "be a facilitator in order to help them get communication with God."

Wolfe also testified that, in order to aid counselees in this communication, he had found it necessary for him to discover their problems; that many persons, particularly those in their pre-adolescent and adolescent years, were "unable to communicate and perhaps not being able to as well as they would like"; that he could not help a person to receive help from God without first finding out "what's wrong with them"; and that "massaging their backs and legs in order to relax them ... helped a great deal in our communication."

He denied having any sexual motivation for his massaging activities.

Plaintiffs' claims against the Church were based upon evidence which, if credited, would support the finding that the elders of the Church were, during the time that the minor was in counseling with Wolfe, made aware of Wolfe's massaging techniques and alleged improprieties with other counselees, but they made no investigation and took no steps to put a stop to his activities.

The issues of liability submitted for jury determination, all of which were resolved in plaintiffs' favor, were:

—Whether Wolfe or the Church violated a fiduciary duty owed to either of the plaintiffs;

—Whether the actions of Wolfe or the Church constituted outrageous conduct;

—Whether the Church was negligent in its hiring or supervision of Wolfe;

—Whether the Church ratified Wolfe's action; and

—Whether the minor was comparatively negligent.

Although one was requested by the defendants, no instruction was given with respect to the significance of Wolfe's alleged sincere belief that massage facilitated a counselee's communication with God.

I.

We first reject the defendants' general assertion that, under the evidence presented here, any judgment against either of them would, in violation of the First Amendment, constitute an unlawful abridgement of their freedom of religion under the free exercise clause thereof or an improper intrusion into religious matters under its establishment clause, or both.

### A.

In *Destefano v. Grabrian,* 763 P.2d 275 (Colo.1988) our supreme court held that the free exercise clause of the First Amendment was not implicated by a civil action against a priest for damages suffered as a result of the priest's consensual sexual relationship with a parishioner, which commenced during the course of pastoral marriage counseling with both the parishioner and her husband. That conclusion, however, was based upon the admitted fact that the sexual activities of the priest were not "dictated by his sincerely held religious beliefs [and were not] consistent with the practice of his religion." Had such conduct been based upon such a belief or practice, the circumstances would have presented "a difficult first amendment issue." *Destefano v. Grabrian,* 763 P.2d at 284.

Here, however, Wolfe asserts that, unlike the priest's activities in *Destefano,* any touching of the minor that might have occurred was not designed to satisfy any of Wolfe's sexual desires, but was intended to facilitate the minor's communication with God. We must, therefore, consider the effect that such assertion has upon Wolfe's common law liability.

The First Amendment contains both a guarantee that persons shall have the right to exercise their "religion" freely and a prohibition that the government shall not establish any "religion." It has been made applicable to the states by the Fourteenth Amendment. *Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

■ Whether a person's beliefs are "religious" for purposes of the First Amendment, or are based simply upon moral or political values, is a question for the court. However, in construing the free exercise clause, the term "religion" has received an expansive interpretation. *See United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (for purpose of exemption from draft, a "religious" belief is simply the "ultimate," imperative, belief of an individual; belief in an external power not necessary). Thus, beliefs are "religious" for First Amendment purposes even if they are not acceptable, logical, consistent, or comprehensible. Only claims "so bizarre, so clearly nonreligious in motivation" should be denied free exercise protection. *Thomas v. Review Board,* 450 U.S. 707, 715, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624, 632 (1981). *See also* Note, *Toward a Constitutional Definition of Religion,* 91 Harv.L.Rev. 1056 (1978).

Here, Wolfe's reliance upon the efficacy of massage as a means of enhancing communication with God may more accurately be described as a "practice," rather than as a "belief." Nevertheless, if his testimony is accepted, that this is a technique that he has found to be useful in furthering such communication, the practice has just as much a religious basis as would the practice of those who assume that a moment of silence facilitates such communication.

■ Further, if Wolfe's belief in such a practice is sincere, there need be, contrary to the views of the trial court, no necessity for further evidence to establish a "religious or Biblical justification" for the practice. On the contrary, if the belief or practice can be classified as religious, courts may not inquire into the validity of such belief or practice. *United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944); *Wolf v. Rose Hill Cemetery Ass'n,* 832 P.2d 1007 (Colo. App.1991).

Nevertheless, belief is one thing, conduct another. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). And, there are instances in which courts have imposed civil liability upon pastors and churches for their conduct, even though such conduct was inspired by a religious belief. In other instances, the religious nature of the conduct has been deemed to provide a defense to a civil claim based on that conduct. *See Christofferson v. Church of Scientology, Inc.,* 57 Or.App. 203, 644 P.2d 577 (1982) (cited with approval in *Destefano v. Grabrian, supra* ). *See generally* Annotation, *Free Exercise of Religion Clause of First Amendment as Defense to Tort Liability,* 93 A.L.R.Fed. 754 (1989); Note, *Intentional Infliction of Emotional Distress by Spiritual Counselors: Can Outrageous Conduct Be "Free Exercise"?,* 84 Mich.L.Rev. 1296 (1986).

■ Here, the jurors were not required to believe Wolfe's testimony concerning his motivation. And, the evidence was sufficient to allow a reasonable fact finder to infer that the minor was touched by Wolfe in an inappropriate manner for Wolfe's personal, rather than for any religious, purposes. Hence, if the jury's verdicts and resulting judgment were based upon the determination that the touching described by the minor was not religiously motivated, the free exercise clause of the First Amendment is simply not implicated by such a verdict. *Destefano v. Grabrian, supra.*

We conclude, therefore, that the nature of the evidence presented here was such that liability could be imposed upon Wolfe for his conduct without offense against the First Amendment's free exercise clause.

### B.

The Church does not assert that it shared Wolfe's alleged beliefs concerning the religious efficacy of touching during counseling sessions. Hence, it does not assert a direct violation of *its* free exercise rights. Relying upon *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), however, both it and Wolfe argue that allowing civil judgments against pastoral counselors and their churches, based upon conduct occurring during counseling sessions, could so "entangle" the government with religious practices as to violate the establishment clause of the First Amendment.

This argument has been rejected by our supreme court in *Moses v. Diocese of Colorado,* 863 P.2d 310 (Colo.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994), a decision rendered after the parties' briefs were filed in this court. There, our supreme court concluded that:

Application of a secular standard to secular conduct that is tortious is not prohibited by the Constitution. The Supreme Court has not granted churches broad immunity against being sued in civil courts. Civil actions against clergy members and their superiors that involve claims of a breach of fiduciary duty, negligent hiring and supervision, and vicarious liability are actionable if they are supported by competent evidence in the record.

*Moses v. Diocese of Colorado, supra,* at 320–21 (citations omitted). *See also Bishop & Diocese v. Mote,* 716 P.2d 85 (Colo.1986), *cert. denied,* 479 U.S. 826, 107 S.Ct. 102, 93 L.Ed.2d 52 (1986).

We consider *Moses* to be dispositive of the defendants' establishment clause assertions here.

### II.

While we conclude that the evidence presented was sufficient to allow liability to be imposed upon both Wolfe and the Church without offending against any stricture imposed by the First Amendment, we also conclude that, because of the lack of an instruction upon Wolfe's alleged belief, the nature of the verdicts returned by the jury upon the minor's claims, and the receipt of prejudicially improper expert testimony, the judgments for both the minor and the mother must be reversed.

### A.

■ As a corollary to the argument that the evidence was such that the free exercise clause of the First Amendment barred the entry of judgment in plaintiffs' favor (which we have rejected), Wolfe also argues that, at the least, the trial court erred in refusing to give any instruction upon the significance of Wolfe's alleged sincerely held religious belief in the efficacy of massage. Given the testimony here, we agree.

While Wolfe denied touching the minor, plaintiffs, in an attempt to prove that he did engage in sexual conduct with him, introduced evidence that Wolfe massaged other counselees. Wolfe admitted engaging in some touching of other persons, but explained that such other touching was a technique based upon his desire to facilitate communication with God and did not involve any touching beyond the back and lower legs.

Given this testimony as to Wolfe's practices with other counselees, the jury could have determined that he engaged in the same practice with the minor. Further, the trial court recognized that, if the jury deter-

mined that any touching of the minor by Wolfe was "of a wholly innocent and incidental nature," defendants were entitled to a judgment. No instruction embodying this concept was given, however, and the lack of an instruction upon the subject was error.

Wolfe tendered an instruction that relied upon the First Amendment as a complete defense. Irrespective of whether that instruction was correct in form, the offering of it by Wolfe was sufficient to require the trial court to fashion a proper instruction on the subject. *See Lee v. Great Empire Broadcasting, Inc.*, 794 P.2d 1032 (Colo.App.1989).

Hence, on retrial, if the evidence upon this subject is essentially the same as that presented previously, the jurors should be instructed that, if Wolfe touched the minor only in the manner in which he described touching other counselees, that such touching was engaged in solely in a sincere effort to facilitate the minor's communication with God, and that Wolfe was not motivated by any personal desires, then the jury must conclude that Wolfe did not violate any fiduciary duty owed to the minor or to his mother nor did he engage in any outrageous conduct toward either of them.

### B.

As noted, the minor alleged that Wolfe violated a fiduciary duty owed to him and that Wolfe's actions constituted outrageous conduct. He also asserted that the Church was negligent in its hiring and supervision of Wolfe, that the Church had ratified Wolfe's actions after it became aware of them, and that the Church had, itself, violated a fiduciary duty owed to the minor, all of which constituted outrageous conduct by the Church.

However, the minor did not assert or present any evidence that he suffered *separate* injuries or damages from each of the two claims asserted against Wolfe. Likewise, he made no assertion that any action of the Church caused him any injury or damage that was *separate from* or *in addition to* those caused by Wolfe. While he asserted that the Church independently violated a fiduciary duty by failing to investigate allega-

tions against Wolfe, his claims against the Church were designed to require it to bear responsibility for the injuries caused the minor by Wolfe's actions. The various claims asserted by the minor, therefore, were simply alternative legal theories, based upon identical evidence, pursuant to which he sought recovery for the same injuries.

In its jury instructions, the court recognized and advised the jurors that all of the minor's claims were based on "the *same* or *similar* injuries and losses." (emphasis supplied) The jurors were also instructed that they should not assess damages under one theory of recovery that they had assessed under another theory. However, in separate instructions on each of the several claims, the jurors were advised that they could consider virtually the identical items of damages or injury with respect to each claim, and they were provided no instructional guidance as to the manner in which they were to divide the total damages suffered by the minor among the various claims asserted by him.

The jurors were required to return *four* verdicts and one special interrogatory with respect to the *six* claims asserted by the minor. They were provided with only a single verdict form with respect to the two claims (one against Wolfe and one against the Church) that alleged violations of a fiduciary duty. With respect to these two claims, the jurors were allowed to decide the relative responsibility of both defendants based on their respective fault, and they were told that, with respect to these two claims, they were required to state a single amount of damages, but that they were required to apportion the total award between the two defendants.

In addition, the jurors were provided a separate verdict form for the claim based upon the Church's alleged negligent hiring and supervision of Wolfe, as well as two separate verdict forms for the two outrageous conduct claims. Finally, the jury was provided with a special interrogatory upon the question whether the Church had ratified Wolfe's actions.

Based on these instructions and verdict forms, the jurors awarded the following damages to the minor:

a.  They awarded the total sum of *$156,-228* in a single verdict on the two fiduciary violation claims, apportioning 66% of the fault therefor to the Church and 34% to Wolfe.  The jury further found that the Church had ratified Wolfe's conduct and that the Church was, therefore, liable for Wolfe's 34% share, as well.

b.  They found that the Church's negligent hiring and supervision caused the minor damage in the total amount of *$87,587,* but they also found that the minor was responsible for 4% of this damage.

c.  They found that Wolfe's outrageous conduct caused the minor damage in the amount of *$23,397* and that the church's similar conduct caused *$28,764* in damage to him.

In addition, the jury awarded punitive damages in favor of the minor against Wolfe in the amount of *$50,500* and against the Church for *$80,625.*

The court then added together the amounts stated in each of these verdicts and entered a single judgment against each of the defendants for the total amounts reflected in these verdicts.

■  The record here does not contain a transcript of any discussion with respect to the instructions or verdict forms.  Hence, it does not reflect any objection interposed by defendants to the verdict forms.  However, after the verdicts were received, defendants sought to have them set aside, claiming that they resulted in the award of duplicate damages.  Plaintiffs have not asserted, either in the trial court or here, that defendants' failure to object to the form of the verdicts prevented them from raising this issue, and the trial court addressed the merits of defendants' assertion.  We shall do likewise, and we conclude that the verdicts cannot be sustained on the present record because they either constitute duplicate awards, as defendants urge, or they are inherently inconsistent.

■  If the jury award to the minor for the defendants' breach of fiduciary duty includes damages that the jury awarded him under the outrageous conduct claims, such awards would be improperly duplicative.  *See Lexton-Ancira Real Estate Fund v. Heller,* 826

P.2d 819 (Colo.1992); 1 D. Dobbs, *Law of Remedies* § 3.3(7) (2d ed. 1993).

Even if we were to assume that the law authorizes a jury to apportion damages among tortfeasors, the jury was provided no criteria or bases upon which such an apportionment was to be made among these claims.  Hence, because the jury was authorized to award damages under each claim for the same items of injury or loss, there exists no basis upon which we can determine for what injuries any of these separate awards was intended to compensate.

Further, the separate awards based on the breach of fiduciary claims and the outrageous conduct claims are, in any case, facially inconsistent.

If Wolfe's actions combined with those of the Church to cause a single, indivisible injury, the two defendants would be considered to be joint tortfeasors.  In the case of such a single injury, the damages suffered must be apportioned among the tortfeasors based upon "percentage of . . . *fault* attributable to each of the parties . . . ."  Section 13–21–111.5(2), C.R.S. (1987 Repl.Vol. 6A) (emphasis supplied).  And, the court's submission of only a single verdict form in apparent compliance with this statute with respect to the fiduciary violation claims would lead to the conclusion that that court determined that only a single injury was involved.

On the other hand, if the actions of Wolfe and the Church did not result in a single, indivisible injury, but instead resulted in separate, apportionable injuries, each would be fully liable only for the *injury* caused by his or its own actions; the liability would not, in that case, be based upon relative fault, but upon the nature of the injury that each caused.  *See* § 13–50.5–102(1), C.R.S. (1987 Repl.Vol. 6A) (joint tortfeasors are those who "become jointly or severally liable in tort for the *same* injury" (emphasis supplied)); *Miller v. Singer,* 131 Colo. 112, 279 P.2d 846 (1955); *Panther v. Raybestos–Manhattan, Inc.,* 701 P.2d 145 (Colo.App.1985).  Hence, the court's submission of separate verdict forms for the two outrageous conduct claims would necessarily mean that the court had concluded that separate injuries were sus-

tained by the minor as a result of this conduct, even though it was the same conduct upon which the minor's fiduciary claims were based.

Wolfe and the Church, however, cannot be considered to be joint tortfeasors for one portion, but only several actors for another portion, of the damages sustained by the minor from the same indivisible injury. Hence, the submission of two types of verdict forms to the jury with respect to the breach of fiduciary duty and the outrageous conduct claims, one calling for apportioning damages for a *single* injury and the other requiring assessment for *separate* injuries, was error. Such submission resulted in verdicts that either duplicated damages or were based upon inconsistent findings with respect to the nature of the minor's injuries.

Likewise, it was improper to allow the jury to assess separate damages against the Church, based upon the claim that it negligently hired and supervised Wolfe.

The minor's negligence claim was based on the principle that an employer's negligence in hiring or supervising its employee renders it liable for the harm resulting from that employee's actions. *Connes v. Molalla Transport System, Inc.,* 831 P.2d 1316 (Colo.1992). Therefore, such a negligent employer is liable "*only to the extent* that the harm is caused by the quality of the employee" hired. Restatement (Second) of Agency § 213 comment d (1958) (emphasis supplied).

Here, then, the Church's negligence could have rendered it liable to the minor for the injuries caused by Wolfe, but that negligence did not result in any *additional* harm to him. Again, therefore, the separate damage award against the Church on this basis resulted in a verdict duplicative of the awards rendered against Wolfe.

The judgment entered in favor of the minor against Wolfe and the Church on all of these verdicts for actual damages must be reversed. And, because these actual damage awards must be set aside, the judgment for exemplary damages must also be reversed. Upon retrial, any verdict assessing the minor's actual damages should be limited to a single amount, apportioned under § 13–21–111.5(2), unless the evidence would allow a determination that the minor suffered a separate injury from the actions of each of the two defendants.

## C.

Defendants also assert that the trial court improperly allowed expert witnesses to express their opinions upon standards that should be applied in a pastoral counseling setting and that such testimony allowed the jury to base its verdict upon the concept of "clergy malpractice," which has been rejected by our supreme court. We agree that receipt of portions of the expert testimony constituted prejudicial error.

In *Destefano v. Grabrian, supra,* our supreme court first determined that, while the services performed by a therapeutic counselor and those provided through pastoral counseling often overlap, so long as the cleric providing pastoral counseling is not held out as a therapeutic counselor, the standards of care applicable to therapeutic counseling cannot be applied to a pastoral counselor.

Second, with the *Destefano* opinion, the supreme court joined substantially all of the other courts that have passed upon the issue in rejecting the notion that a claim will lie against a pastoral counselor or the pastor's church based upon the pastor's failure to observe any particular standard of care in providing the counseling; no claim for "clergy malpractice" can be asserted. *See Schieffer v. Catholic Archdiocese,* 244 Neb. 715, 508 N.W.2d 907 (1993); *Bladen v. First Presbyterian Church,* 857 P.2d 789 (Okla.1993); *Byrd v. Faber,* 57 Ohio St.3d 56, 565 N.E.2d 584 (1991); *Strock v. Pressnell,* 38 Ohio St.3d 207, 527 N.E.2d 1235 (1988); *Christofferson v. Church of Scientology, Inc., supra; Schmidt v. Bishop,* 779 F.Supp. 321 (S.D.N.Y.1991); *Jones v. Trane,* 153 Misc.2d 822, 591 N.Y.S.2d 927 (1992).

The judicial rejection of such a claim has been based, in large part, upon the effect that recognition of such a claim would have upon the right of religious expression guaranteed by the First Amendment.

In order to adjudicate a claim based upon the "malpractice" of a religious counselor, courts would first have to establish the degree of skill and learning normally exercised by members of the clergy in similar circumstances and, then, to determine whether such standard had been violated. *See Strock v. Pressnell, supra* (citing Restatement (Second) of Torts § 299A (1965)). To attempt to require members of the clergy to comply with such a standard, however, could very well restrict their right freely to exercise and practice their religion. Indeed, as the federal district court said in *Schmidt v. Bishop, supra,* 779 F.Supp. 321 at 328:

> Any effort by this Court to instruct the trial jury as to the duty of care which a clergyman should exercise, would of necessity require the Court or jury to define and express the standard of care to be followed by other reasonable Presbyterian clergy of the community. This in turn would require the Court and the jury to consider the fundamental perspective and approach to counseling inherent in the beliefs and practices of that denomination. This is as unconstitutional as it is impossible.

Based upon this consideration, several courts have gone so far as to conclude that *no* claim, short of an intentional battery, can lie against a pastor or the religious organization as a result of incidents occurring during pastoral counseling. *See Schieffer v. Catholic Archdiocese, supra* (no liability for emotional damage resulting from consensual sexual relationship); *Schmidt v. Bishop, supra* (no liability for sexual relationship commencing when the plaintiff was only 12). *See also Bladen v. First Presbyterian Church, supra.*

On the other hand, both our supreme court in *Destefano* and the Oregon Court of Appeals in *Christofferson v. Church of Scientology, Inc., supra,* have distinguished a claim based upon clergy malpractice, requiring the judicial promulgation of professional standards, from a claim for breach of some fiduciary obligation that may arise from the confidential relationship between the parties in a counseling setting. This distinction was reemphasized in *Moses v. Diocese of Colorado, supra,* at 321 n. 13 in the following language:

> The fundamental difference between the two causes of action is the former [breach of fiduciary duty] is a breach of trust and *does not require a professional relationship or a professional standard of care,* while the latter [malpractice] is an action for negligence based on a professional relationship and a professional standard of care.

(emphasis supplied)

While the *Moses* language referred to the lack of any *requirement* for proof of a professional standard of care in order to prosecute a claim for the breach of a fiduciary obligation, the distinction drawn by *Moses* was, we think, a recognition that it would be improper under the First Amendment to attempt to *impose* any professional standard of care upon a pastoral counselor, at least in those instances in which the pastor asserts that his conduct is based upon a sincerely held religious belief.

In contrast to a claim based upon the violation of a standard of conduct adopted by professionals, the violation of a fiduciary duty depends upon the nature of the specific duties owed by the fiduciary, which the court determines as a matter of law and upon which it instructs the jury. *See CJI–Civ.3d* 26:3 (1989) (Notes on Use and Source and Authority). And, under an outrageous conduct claim, the defendant's conduct is to be tested by the standards adopted by civilized society, as a whole. *Rugg v. McCarty,* 173 Colo. 170, 476 P.2d 753 (1970).

It is, then, in the light of our supreme court's distinction between the two claims that we must evaluate whether the admission of the expert opinion here was error.

Plaintiffs offered four experts. The first, a minister and director of a church-operated center for domestic and sexual abuse prevention, was tendered as an "expert in theology" and upon "procedures and practices in church settings necessary to prevent reasonably foreseeable harm." This witness testified, generally, to the fact that the religious counsellor is often looked upon as someone who has been designated as a church leader and that the persons who

counsel with that person place their trust in that authoritarian figure. When that authority figure engages in improper "sexual contact or activity" with the parishioner, harm results because the parishioner feels that he or she has been fundamentally betrayed.

This testimony was admissible under *Moses* because it addressed the question whether there existed a fiduciary relationship between Wolfe and the minor. *See* Restatement (Second) of Torts § 874 (1979); *Paine, Webber, Jackson & Curtis, Inc. v. Adams,* 718 P.2d 508 (Colo.1986) (existence of such a relationship is a question of fact).

However, over objection, this witness was also allowed to testify that "nudity or partial nudity" is "inappropriate in the pastoral relationship." This witness said that, while such might be appropriate in either a "medical setting" or in a "situation with a licensed massage therapist," such activity is "unnecessary" and "inappropriate" in either a therapeutic or a pastoral relationship.

The second expert was accepted as a person "qualified to give opinions on diagnosis, treatment, and prognosis" in the psychiatric field. This witness was first permitted, over objection, to testify that the description given by the minor of Wolfe's "counseling" constituted "sexual abuse." He was also permitted to testify that, in his "professional experience," it is never "appropriate" to remove the shirt of a counselee, or to remove his pants, or to rub his back, or to rub his thigh. According to this expert, "in terms of therapy [such acts] would be considered to be sexually abusive."

The third witness, a licensed professional counselor, was offered as an expert in psychotherapy. The substance of this witness' testimony can be summarized in the following excerpt:

Q. Have you formed an opinion, within a reasonable degree of psychological probability, as to whether or not, based on the description given to you by [the minor], [the minor] was sexually abused?

A. Yes, I have.

Q. What's that opinion?

A. My opinion is yes, under the opinion that with current law in psychological ethics, going back to the early 80's that any touching of—any sexual-type touching can be interpreted as massaging legs up to the crotch, massaging the back. It's just highly unadvisable in this field to be touching people, especially under the clothing.

Q. Mr. Sims, were you here for part of Mr. Wolfe's testimony last week?

A. Yes, I was.

Q. Do you believe—can you tell the jury whether or not there's anything in what he said that supports the kind of touching that he says he did?

A. As far as Biblically?

Q. Biblically or therapeutically.

A. Therapeutically—either therapeutically or Biblically there's no evidence that should happen or it is good for people.

. . . .

Q. ... [I]s there evidence that children should be touched during therapy?

A. Yes. Children should never be touched during therapy. The most touching, if you want to call it that, would be as child is leaving, if they initiate a side hug at the door, or the parents are there and it's safe. It should not be forced upon them or done without their permission or request.

The final witness was an expert in psychology who had extensive experience in supervising pastoral counselors. During voir dire, this witness proposed that she would offer opinions as to "how a minister in any church would conduct counseling insofar as it relates to certain behaviors" and opinions as to the manner in which Wolfe should have conducted his pastoral counseling. This witness then testified, in part, as follows:

Q. Is there anything about the way that Homer Wolfe used *The Gift of Sex* in therapy that was dangerous?

A. The notion of having people compare their genitals to those in the book to see if they've been properly circumcised, I think is not something that's legitimate counseling or likely to be helpful. It's quite likely to be confusing and harmful, particularly in a pastoral counseling context.

Q. Is there anything about the nudity that is described in one of the exercises that is potentially dangerous in a counseling situation?

A. Yes. The book recommends to couples who are attempting to improve their sex life within a Christian framework to get to know their bodies and look at themselves nude and feel better about their bodies, and the book suggests you do that. That, obviously is a highly risky proposition to do in a counseling session or with an individual.

Some of this testimony, then, condemned any touching of a minor counselee, even that which could be considered non-sexual in nature. This testimony, therefore, articulated a standard for the conduct of pastoral counseling and tended to establish that, even if Wolfe's motives were innocent, he violated such standard if he touched the minor. In addition, in at least one instance, the expert was allowed to state that Wolfe's belief, that his touching was a means of enhancing communication with God, had no therapeutic or *Biblical* support.

The receipt of this expert testimony was prejudicially erroneous for several reasons.

■ First, a portion of this testimony was irrelevant. For example, there was no evidence that Wolfe asked the minor to compare his genitals to photographs in any book. Hence, the "appropriateness" of any such conduct was not relevant to any portion of the minor's claim. At best, it related to incidents allegedly occurring during sessions with other counselees.

■ Second, some of this testimony called into question the validity of Wolfe's beliefs concerning the efficacy of touching, which he claimed to be grounded in his religious principles. To the extent that such testimony was intended to present a jury question as to whether Wolfe's techniques were, in fact, valid from a Biblical standpoint, the First amendment prohibited its consideration for this purpose. *See Wolf v. Rose Hill Cemetery Ass'n, supra,* at 1009 (First Amendment prohibits the judicial resolution of disputes "by inquiring into and resolving disputed issues of religious doctrine and practice").

■ Third, this testimony, at least in several instances, referred to the appropriateness of touching from a *therapeutic* standpoint. To this extent, it was irrelevant. *Destefano* expressly held that a pastor's counseling activities are not to be governed by standards applicable to a secular therapist.

■ Further, this testimony sought to establish a professional standard for *pastoral* counseling, *i.e.,* that a minor counselee should never be touched by any counselor. And, unless the proffering of such testimony was intended to allow the jurors to determine that Wolfe violated this professional standard, it was irrelevant to any issue that they were to decide. But, to allow the jurors to assess liability against Wolfe for violating this standard was tantamount to imposing liability for "malpractice," *i.e.,* for the violation of a professional standard of conduct. *See Moses v. Diocese of Colorado, supra.*

Other evidence presented a genuine issue whether Wolfe touched the minor and, if so, whether such touching was for his personal gratification. And, the jury certainly could have found that such was the case. Based upon the expert testimony, however, the jurors also could have found that, even if Wolfe's reason for the touching was innocent, such touching was improper.

Further, the confusion of the issues created by this expert testimony was exacerbated by the court's instructions to the jury.

At no point in those instructions were the jurors informed upon the specifics of the parties' assertions. They were not informed that plaintiffs' allegation was that Wolfe engaged in inappropriate touching for personal gratification purposes. And, as noted, the court rejected Wolfe's tendered instruction concerning his liability, or lack thereof, if his actions were based upon a sincerely held religious belief and failed to give any instruction upon the subject.

Further, while the jurors were properly presented with the issue of the existence of any fiduciary relationship between the parties, the court failed to instruct them with

respect to the nature of the duty owed by Wolfe and the Church in the circumstances or with respect to the basis for plaintiffs' claim. *See CJI–Civ.3d* 26:3 (1989) (Notes on Use) ("This instruction should be used . . . to describe the fiduciary duty or duties the plaintiff claims the defendant breached and the breach of which, under the applicable law and evidence in the case, would be appropriate for the jury to determine.").

Given this lack of judicial guidance, the jury might well have accepted the specific standard of conduct described by the experts as the standard by which to measure Wolfe's actions. This is particularly so because plaintiff's counsel, in her final argument, was allowed to assert that Wolfe had no "qualifications" for counseling. If the jurors applied such a standard, however, the test used by them would have been indistinguishable from the test used for a professional malpractice claim. *See Moses v. Diocese of Colorado, supra.*

While the experts' testimony with respect to the nature of the relationship between the parties engaging in pastoral counseling was properly received, as was their testimony designed to illustrate the nature of the damage caused the minor, the testimony with respect to the *standards* to be applied to a pastoral counselor was improper. And, given the record here, the receipt of such testimony was not harmless.

### III.

■ Among the issues raised by defendants that may arise on retrial is Wolfe's assertion that the trial court erred in admitting under CRE 404(b) the testimony of two witnesses with respect to other alleged misconduct by Wolfe. We disagree.

CRE 404(b) provides, in relevant part, that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In *People v. Spoto,* 795 P.2d 1314 (Colo. 1990), our supreme court concluded that, taken together, CRE 401, 403, and 404(b) require that four factors be considered in determining if evidence of other transactions is admissible: (1) whether the proffered evidence relates to a material fact; (2) whether the evidence is logically relevant to any contested issue; (3) whether the logical relevance is independent of the prohibited inference that defendant has a bad character and acted in accordance with that character; and (4) whether the probative value of the proffered evidence is substantially outweighed by any unfair prejudice it might create.

Here, one witness, who was an adult at the time Wolfe counseled with him, testified that, during his counseling sessions with Wolfe, Wolfe had him remove his shirt and pants after which Wolfe would massage his back, chest, and thighs while stating that God loved him. Later in their counseling relationship, Wolfe allegedly had the counselee completely disrobe in front of a mirror, whereupon Wolfe then allegedly inspected the counselee's penis and asked to touch it. The witness refused Wolfe's request. Finally, this witness testified that, in later counseling sessions, Wolfe had him masturbate while Wolfe's hand was on top of his.

The second witness, who was a minor at the time he was counseled by Wolfe in 1981 or 1982, said that, during his first counseling session, Wolfe had him remove his shirt and pants and massaged him. Wolfe also allegedly asked to inspect the witness's genitals, felt them, and commented that he was properly circumcised. This witness testified that, after this incident, he never returned to Wolfe for counseling, but that he did not report the incident to the church elders until 1989.

The testimony of these two witnesses is partially consistent with Wolfe's description of his counseling technique. He testified that he had counseled both these witnesses and that he had massaged both of them. He also testified that he had inspected the minor witness' genitals and that he also had assisted the adult witness in conducting the disrobing exercise in front of a mirror in Wolfe's office. Wolfe repeatedly denied, however,

that there had been any genital contact or any sexual motive involved in his counseling sessions with either witness.

Further, Wolfe denied any recollection of any physical contact—genital or non-genital—with the minor. Alternatively, he asserted that any genital contact with the minor that might have occurred was incidental and unintentional.

The trial court held that the proffered testimony satisfied all four tests set forth in *Spoto*. We agree.

First, the testimony of the two witnesses related to material issues of fact, *i.e.*, whether Wolfe's counseling techniques exhibited a pattern of behavior motivated by his sexual interests; whether Wolfe had, in fact, touched the minor plaintiff's genitals; and whether any such contact was accidental or intentional. Plaintiffs' assertion was that Wolfe's conduct with the minor was merely part of a pattern of predatory sexual behavior involving male counselees whom Wolfe knew to be vulnerable because of past traumatic experiences.

Second, such evidence was also logically relevant because it had the tendency to make the existence of Wolfe's alleged conduct with the minor plaintiff more probable. *See People v. Carlson*, 712 P.2d 1018 (Colo.1986).

Third, the logical relevance of this evidence is independent of the prohibited inference that defendant has a bad character and that he acted in accord with that character. Considering that each prior incident took place during a counseling session, involved a male counselee who was emotionally vulnerable because of a prior trauma of which Wolfe was allegedly aware, and involved disrobing and alleged genital contact, we conclude that these prior incidents are sufficiently similar to the circumstances here to make them probative of whether Wolfe did touch the minor and, if so, whether it was intentional, sexually-motivated contact rather than unintentional or incidental contact.

While this evidence admittedly might also lead to the inference that Wolfe acted in accordance with his alleged bad character, the fact that such an inference may be drawn does not render the evidence inadmissible, so long as the proffered evidence has a logical relevance independent of that inference. *See People v. Snyder*, 874 P.2d 1076 (Colo.1994); *People v. Spoto, supra.*

Finally, we cannot conclude, as a matter of law, that the potential prejudicial effect of this evidence outweighs its probative value. A trial court is vested with wide discretion in determining the potential prejudicial impact of proffered evidence, and we will not reverse the trial court's ruling unless it is manifestly erroneous. *See Campbell v. People*, 814 P.2d 1 (Colo.1991); *People v. Williams*, 790 P.2d 796 (Colo.1990).

Further, our supreme court has mandated that "we must assume the maximum probative value that a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected." *See People v. Lowe*, 660 P.2d 1261, 1264 (Colo. 1983); *see also People v. Aldrich*, 849 P.2d 821 (Colo.App.1992) (admission of magazines containing explicit sexual material found at defendant's home tended to corroborate victim's allegation of sexual abuse and were more probative than prejudicial).

Here, our review of the record convinces us that the trial court's admission of this evidence was not manifestly erroneous, and thus, under similar circumstances, it may properly be admitted on retrial.

■ The evidence of these two witnesses, together with the testimony that two other parishioners had met with the Church elders and had related to them accusations against Wolfe made by other young male counselees, was allowed also to be considered by the jurors on the issue whether the Church had notice of Wolfe's activities. The Church asserts that its admission for this purpose constituted prejudicial error. We disagree.

An essential element of plaintiffs' negligent hiring and supervision claim against the Church was the Church's actual or constructive knowledge of any derelictions by Wolfe. *See Destefano v. Grabrian, supra.* Such evidence was properly admissible for this limited purpose, and the jury was properly instructed to consider it only for this purpose. *See Conrad v. City & County of Denver*, 656

P.2d 662 (Colo.1982); *Hansen v. Lederman,* 759 P.2d 810 (Colo.App.1988).

Finally, we are convinced that the trial court correctly determined that the probative value of such of such evidence outweighed its prejudicial impact. *See People v. Williams, supra; People v. Lowe, supra.* Hence, again, under similar circumstances and with similar instruction, such evidence may be admitted on retrial.

## IV.

The Church was determined to be liable for Wolfe's breach of the fiduciary duties owed both to the mother and to the minor, based on the claim that it ratified Wolfe's actions. The Church asserts, however: (1) that the alleged intentional actions of Wolfe here cannot be ratified; (2) that the Church cannot be rendered liable under a ratification theory for its employee's tortious conduct that is outside the scope of employment; and (3) that insufficient evidence of ratification was presented. We disagree with all three contentions.

### A.

■ An employer can assume liability for the tortious conduct of its employee by approving and ratifying such conduct, irrespective whether that conduct is intentional or negligent. *See Frick v. Abell,* 198 Colo. 508, 602 P.2d 852 (1979) (claim that police department ratified assault and battery by police officer); *Stortroen v. Beneficial Finance Co.,* 736 P.2d 391 (Colo.1987) (principal may become liable for agent's misrepresentations to buyer). Thus, we reject the Church's assertion that Wolfe's conduct, because it constituted an intentional tort, cannot be the subject of ratification.

### B.

■ An employer may ratify the unauthorized act of its employee, *i.e.,* an act not within the scope of the employment, and thereby become obligated to the same extent as if the principal had originally authorized the act. *See Poudre Valley Furniture Co. v. Craw,* 80 Colo. 353, 251 P. 543 (1926); *M.S.P.*

*Industries, Inc. v. Diversified Mortgage Services, Inc.,* 777 P.2d 237 (Colo.App.1989).

Hence, it is no defense for the Church here that Wolfe's alleged conduct with the minor fell outside the scope of his defined job responsibilities. *See generally* 1 S. Speiser, C. Krause & A. Gans, *The American Law of Torts* § 4.5 (1983).

### C.

■ In order for an employer to be liable by ratification for the unauthorized act of its employee, the evidence must establish the employer's adoption and confirmation of that act. *See Nunnally v. Hilderman,* 150 Colo. 363, 373 P.2d 940 (1962). And, an employer must have full knowledge of the character of the employee's act before it may be said to have ratified that act. *Adams v. Paine, Webber, Jackson & Curtis, Inc.,* 686 P.2d 797 (Colo.App.1983), *aff'd,* 718 P.2d 508 (Colo.1986).

■ The fact that an employer retains an employee after gaining knowledge of the employee's tortious conduct is evidence that may prove ratification of the employee's acts. However, retention of an employee, without more, is not conclusive evidence of such ratification. *See Frick v. Abell, supra.* Further, numerous acts of an employee committed over a period of time can constitute evidence of an implied ratification of that conduct by the employer. *See Goetz v. Security Industrial Bank,* 508 P.2d 410 (Colo.App.1973) (not selected for official publication). *See also* Restatement (Second) of Agency § 91 comment c (1958) ("knowledge [necessary for ratification] by the purported principal can be inferred ... when he has such information that a person of ordinary intelligence would infer the existence of the facts in question").

■ The question whether an employer has ratified its employee's unauthorized tort is one of fact. And, a fact finder may determine that an employer has ratified its employee's tortious acts from any course of conduct, including an omission to act, that reasonably tends to demonstrate an intention on the part of the employer to ratify that conduct. *See Brown v. Burlington Indus-*

*tries, Inc.*, 93 N.C.App. 431, 378 S.E.2d 232 (1989) (employer's ratification of employee's sexual harassment of fellow worker); Restatement (Second) of Agency §§ 93 and 94 (1958).

■ Here, the evidence was sufficient to allow the finding that the Church elders were aware of Wolfe's alleged inappropriate counseling behavior as early as 1986. It began receiving complaints from various parishioners with respect to his conduct, starting in 1986 and continuing through 1987 and 1988. Indeed, the minutes of several Church elders' meetings during 1986 and 1987 reflect that the elders were concerned with respect to the Church's "liability and responsibility" for Wolfe's counseling; that Wolfe might be involved in "medical," rather than religious counseling; and that "many parents are complaining" about Wolfe. Further, there was evidence, as noted, of specific complaints against Wolfe made by various parishioners, and there was other evidence that the Church failed effectively to respond to such allegations.

Thus, under a similar evidentiary posture on retrial, recovery on a theory of ratification should again be presented for jury resolution.

## V.

■ On cross-appeal, the minor asserts that the trial court erred in allowing the jury to consider the question of the minor's comparative negligence as a defense to his claim that the Church was negligent in its hiring and supervision of Wolfe. On this issue, the jury found that the minor was four percent negligent, and the court reduced his damages accordingly. *See* § 13–21–111, C.R.S. (1987 Repl.Vol. 6A). We agree that this issue should not have been submitted to the jury.

■ Generally, a child seven years of age or older is under a duty to exercise the degree of care that would reasonably be expected of a child of like age, intelligence, and experience. *See Calkins v. Albi*, 163 Colo. 370, 431 P.2d 17 (1967); *Benallo v. Bare*, 162 Colo. 22, 427 P.2d 323 (1967). A child who fails to exercise such ordinary care in protecting himself or herself from an unreason-able risk of harm may be found negligent in contributing to his or her own injuries. *See Benallo v. Bare, supra; Lakeside Park Co. v. Wein*, 111 Colo. 322, 141 P.2d 171 (1943). Comparative negligence principles, however, are applicable only if there is evidence that would support a finding that both parties are at fault. *Dunham v. Kampman*, 37 Colo. App. 233, 547 P.2d 263 (1975), *aff'd*, 192 Colo. 448, 560 P.2d 91 (1977); *Powell v. City of Ouray*, 32 Colo.App. 44, 507 P.2d 1101 (1973).

Here, there was no evidence that would support a finding that the minor unreasonably subjected himself to the risks associated with Wolfe's counseling.

The minor was only seven when he entered counseling, and he continued to see Wolfe until the time he entered middle school. He entered into the counseling relationship only at Wolfe's behest and at his mother's direction. Indeed, there was testimony from both the minor and the mother that he was often quite reluctant to see Wolfe and had to be persuaded to do so. The minor also testified that Wolfe told him that the counseling was confidential and that the minor should not discuss with others the contents of their sessions.

Finally, plaintiffs' expert opined that, in situations involving the abuse of a child by an adult in a position of trust, it is common for the child not to report it to others. The Church offered no testimony to contradict this view, nor did it offer any testimony respecting the reasonable standard of conduct of a child of the minor's age in such circumstances.

We conclude, therefore, that the evidence failed to establish, as a matter of law, any negligence on the part of the minor. Hence, on retrial, unless there is additional evidence produced on this issue, the question of the minor's negligence should not be considered by the jury.

The judgments in favor of the plaintiffs are reversed, and the cause is remanded to the trial court for a new trial in accordance with the views expressed in this opinion.

TAUBMAN, J., specially concurs.

DAVIDSON, J., dissents.

Judge TAUBMAN specially concurring.

I concur with the conclusion in the dispositive opinion that a new trial is necessary because the judgment resulted in duplicative or inconsistent damage awards and that the trial court admitted improper expert testimony. I further agree that, on retrial, assuming the presentation of similar evidence as in the first trial, the trial court should submit to the jury an instruction in the form set forth in the dispositive opinion that would require a verdict in favor of defendants if the jury determines, *inter alia,* that Wolfe's conduct was based on a sincerely held religious belief. Further, I agree with the dispositive opinion's treatment of the remaining issues and the cross-appeal. However, I write separately because of the importance I attach to defendants' claims that liability could not be imposed upon them without violating their rights under the free exercise clause of the First Amendment.

As the dispositive opinion notes, Wolfe consistently maintained that his counseling methods, including the massage technique, were inspired by his religious beliefs which were based on his interpretation of the Bible. Wolfe also consistently asserted that his counseling techniques were not motivated by any sexual desires on his part. Instead, he maintained that he employed the massage technique to facilitate communication between the counselee and God.

The central issue presented by this case, in my view, is that left unanswered by the supreme court in *Destefano v. Grabrian,* 763 P.2d 275 (Colo.1988). There, in a case involving alleged sexual misconduct by a Roman Catholic priest, the court recognized that: "If the alleged misconduct of [the defendant] was dictated by his sincerely held religious beliefs or was consistent with the practice of his religion, we would have to resolve a difficult First Amendment issue." *Destefano v. Grabrian, supra,* at 284.

In *Destefano* and, more recently, in *Moses v. Diocese of Colorado,* 863 P.2d 310 (Colo. 1993), the supreme court has held that civil actions against clergy members and their superiors that involve claims of breach of fiduciary duty, negligent hiring and supervision, and vicarious liability are actionable if

they are supported by competent evidence in the record. In those cases the court declined to grant churches and clergy broad immunity against being sued in civil courts.

Nonetheless, the defendants in those cases did not claim that their conduct was dictated by sincerely held religious beliefs or was consistent with their religious practices. However, the "difficult First Amendment issue" anticipated by the supreme court is precisely the situation we have here. Defendant Wolfe consistently has maintained that his counseling of the minor plaintiff was dictated by his sincerely held religious beliefs and was consistent with the practice of his religion.

Unlike in *Moses,* in which the defendants' First Amendment claims were first raised in the supreme court, Wolfe and the Bear Valley Church of Christ raised their First Amendment contentions early on. They moved for directed verdicts, based on the First Amendment, after plaintiffs' case-in-chief and at the conclusion of the presentation of evidence. The trial court denied those motions. In addition, the trial court denied defendants' similar motions for judgment notwithstanding the verdict. Finally, defendants tendered a jury instruction, which the trial court denied, regarding whether Wolfe's conduct was motivated by a sincerely held religious belief. Consequently, the jury was never informed that the First Amendment was implicated in any way whatsoever.

The First Amendment protects against state action involving the "establishment of religion, or prohibiting the free exercise thereof." State action includes common law tort rules, *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and court action. *Bernson v. Koch,* 35 Colo. App. 257, 534 P.2d 334 (1975).

Whether Wolfe's beliefs are arguably religious in nature is a legal question which must be determined by the court. Courts are to decide whether a person's beliefs are, in his or her own scheme of things, religious. *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

Beliefs are adequately religious even if they are not acceptable, logical, consistent, or

comprehensible. Only claims "so bizarre, so clearly non-religious in motivation should be denied free exercise protection." *Thomas v. Review Board, Indiana Employment Security Division,* 450 U.S. 707, 715, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624, 632 (1981). All that matters is that the person hold the religious belief. *United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944).

Hence, a party must show that there is a coercive effect against the practice of his or her religion when challenging governmental action as an infringement of his or her free exercise rights. *Destefano v. Grabrian supra, citing Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

Thus, when making the determination whether a belief is religious, the court must look to the defendant's assertions rather than the contentions made in the complaint or the evidence presented by the plaintiff. If the court concludes that a defendant's assertions are not based on a religious belief, the First Amendment does not afford protection. *See Africa v. Commonwealth of Pennsylvania,* 662 F.2d 1025 (3d Cir.), *cert. denied,* 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982) (holding organization was not a religion because it did not address fundamental and ultimate questions, was not comprehensive in nature, and did not exhibit similar manifestations associated with more traditional religions); *Church of the Chosen People v. United States,* 548 F.Supp. 1247 (D.Minn.1982) (holding "Demigod Socko Pantheon" was not a religion, in part because it was not organized and operated exclusively for religious purposes).

Here, defendants have consistently asserted that Wolfe's conduct was based on his religious beliefs. Furthermore, Wolfe's assertions regarding his use of massage as a spiritual counseling technique are not so bizarre or clearly non-religious that they should be denied First Amendment protection. In fact, many Christian sects advocate the laying on of hands by clergy on parishioners for consecration, blessing, invocation, and communication with God. *See Dictio-*

*nary of Christianity in America* 636 (R. Linder ed. 1990).

If the court concludes that a defendant's beliefs are religious, the First Amendment prohibits any governmental action, including tort remedies, that substantially burdens the free exercise of religion, unless there is a compelling state interest and unless the least restrictive means are employed to attain that interest. *Thomas v. Review Board, Indiana Employment Security Division, supra; Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). However, the First Amendment does not provide protection where a defendant's beliefs are not sincerely held. *United States v. Seeger, supra.*

In 1990, the Supreme Court held that the compelling state interest test need not be followed where the impingement on free exercise of religion involves a facially neutral criminal statute of general applicability. *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). However, to the extent *Smith* departed from the prior "free exercise" jurisprudence concerning facially neutral laws of general applicability, it has been legislatively overruled by the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C § 2000bb (1993). *See Western Presbyterian Church v. Board of Zoning Adjustment,* 862 F.Supp. 538 (D.D.C.1994).

Furthermore, the *Smith* decision has been widely criticized as presenting competing answers with pre-*Smith* law to the question when government, while pursuing secular ends, may compel disobedience to what one believes religion commands. *See Church of Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. ——, ——, 113 S.Ct. 2217, 2240, 124 L.Ed.2d 472, 507 (1993) (Souter, J., concurring). *See also* McConnell, *The Origins and Historical Understanding of Free Exercise of Religion,* 103 Harv.L.Rev. 1409 (1990).

RFRA expressly restores the compelling state interest test in cases involving the free exercise clause of the First Amendment and requires that, even when the law undergoing constitutional scrutiny may be a neutral law of general applicability, government actions that substantially burden the exercise of reli-

gion be the least restrictive means of furthering that interest. As a result, RFRA modifies state tort law pursuant to Congress' power to enforce the Fourteenth Amendment legislatively. 42 U.S.C. § 2000bb–3 (1993).

Applying this analytical framework here, I agree with the dispositive opinion's conclusion that by failing to give an instruction concerning whether Wolfe's conduct was dictated by his sincerely held religious beliefs, the trial court committed reversible error. And, as noted, I agree that the form of an instruction as stated in the dispositive opinion is appropriate in the circumstances presented here because it would adequately protect defendant's First Amendment rights. Nonetheless, I would go further and require an instruction limited to whether Wolfe's conduct was motivated by a sincerely held religious belief.

In my view, allowing a tort remedy without, at a minimum, an instruction in the form set forth in the dispositive opinion would substantially burden the free exercise of religion by Wolfe and the Church. *See* Lupu, *Where Rights Begin: The Problem of Burdens on the Free Exercise of Religion,* 102 Harv.L.Rev. 933 (1989) (if government's ends can reasonably be achieved without the imposition of the free exercise burden, relief from the burden may be appropriate). I further conclude that, without such an instruction, there is no compelling state interest here to allow plaintiffs to pursue a tort remedy.

The First Amendment prohibits the court from interpreting or weighing church doctrine. *Moses v. Diocese of Colorado, supra.* In my view, the dispositive opinion properly concludes that attempting to impose any professional standard of care upon a pastoral counselor is prohibited by the First Amendment when the pastor asserts that his or her conduct is based on a sincerely held religious belief. Allowing a tort claim here in the absence of a finding that Wolfe's conduct was not dictated by a sincerely held religious belief would require consideration of the validity of ecclesiastical matters and, therefore, such a claim is barred by the First Amendment. *See Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21

L.Ed.2d 658 (1969); *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1966); *Van Osdol v. Vogt,* 892 P.2d 402 (Colo.App.1994).

Resolution of the First Amendment issue here is indeed difficult since it involves weighing the strong societal interests in allowing tort remedies against those found guilty of sexual harassment or abuse against the freedom of religion claims of a church and minister. Nevertheless, conduct that many people might find objectionable may be protected under the free exercise clause. *See Church of Lukumi Babalu Aye, Inc. v. Hialeah, supra* (city ordinances prohibiting animal sacrifices violated the free exercise clause since they effectively prohibited only sacrifice as practiced by the Santeria religion). *Harris v. Harris,* 343 So.2d 762 (Miss.1977) (mother, who belonged to a fundamentalist sect which believed in snake handling, had a right to practice her faith and to indoctrinate her child in her religious beliefs so long as she had custody and there was no proof that child was exposed to risk of being bitten by a snake).

In *Destefano,* the defendants conceded that the priest's conduct fell outside the practices and beliefs of the Roman Catholic church and, thus, was not protected by the First Amendment. No comparable admissions were made here. Instead, Wolfe has consistently maintained that his actions were legitimate manifestations of pastoral counseling. He argues that his pastoral counseling methods were motivated by the Scriptures and were purely ecclesiastical in nature. Hence, a decision that examines Wolfe's counseling techniques would require interpretation of church doctrine in violation of the First Amendment.

Indeed, that is precisely what occurred during the jury trial. Plaintiffs presented expert witnesses, as the dispositive opinion has clearly described, who attempted to establish a standard of care for pastoral counseling. Similarly, several elders testified for the Church about their understanding of Biblical counseling. In short, the jury was asked to weigh church doctrine, after hearing not only from lay witnesses but from "ex-

perts" on church doctrine. If the jury finds on retrial that Wolfe's conduct was dictated by a sincerely held religious belief, then the First Amendment would prohibit plaintiff's breach of fiduciary duty and outrageous conduct claims because those tort remedies would substantially burden the free exercise of his religion without any compelling state interest.

However, even if a compelling state interest existed, the court must use only the least restrictive means in regulating religious activities. *Thomas v. Review Board, Indiana Employment Security Division, supra.* In my view, to impose liability based on claims of breach of fiduciary duty and outrageous conduct, where a defendant's conduct is based on a sincerely held religious belief would require the trier of fact to make prohibited inquiries into religious faith and, thus, would violate the least restrictive means test. *See Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, supra.*

Accordingly, I agree that, on retrial, the trial court should give a jury instruction in the form set forth in the dispositive opinion as to whether Wolfe based his actions on a sincerely held religious belief. *See United States v. Seeger, supra* (whether claimant's religious belief is sincerely held is question of fact).

Finally, my views based upon the First Amendment would not allow wrongful sexual conduct by a clergyman to go unpunished. In many cases, such as *Destefano* and *Moses,* the conduct complained of will not be alleged to be motivated by a sincerely held religious belief. In those situations, a tort remedy would be permissible.

In other cases, as here, where the First Amendment is asserted as a basis for challenged conduct, plaintiffs could assert that such conduct was not based upon a sincerely held religious belief and would be entitled to have a jury resolve that issue. Furthermore, even in circumstances in which conduct is said to be based upon a sincerely held religious belief and such claim is upheld by a jury, the state could still prosecute a clergyman for violation of the state's criminal laws. *See Schmidt v. Bishop, supra.*

Thus, while the issues presented here are indeed difficult to resolve, they cannot be resolved properly without consideration of the First Amendment.

Judge DAVIDSON dissenting.

Because I conclude that the protection of the First Amendment free exercise clause is not available to these defendants and therefore no instructional error occurred, because I disagree that the plaintiffs' experts necessarily expressed that Wolfe violated a professional standard of care, and because I perceive no reversible error as to damages, I would affirm the judgment with one modification. Therefore, I respectfully dissent.

I.

*First Amendment*

A.

In my view, Wolfe's assertions do not pass the preliminary test of whether his conduct was a part of a sincerely held religious belief. Hence, no jury instruction on the issue was necessary.

1.

If a person raises the free exercise clause as a defense, the threshold question is whether the *conduct complained of* is religious. *See Destefano v. Grabrian,* 763 P.2d 275 (Colo.1988).

Thus, it is not sufficient for Wolfe to claim free exercise clause protection because he is a minister, or because the counseling sessions included prayer and discussion of spiritual matters. *See Destefano v. Grabrian, supra.* To invoke free exercise clause protection, the conduct in question must be a professed religious practice or rooted in a religious belief. *See Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

According to the evidence, the massage of young males—as practiced by Wolfe and which, by his own admission, included removal of their shirts and pants, and massage of their backs and legs—is contrary to a generally held societal view that children should

not be touched in that manner outside of bona fide medical treatment.

Wolfe argues, nonetheless, that he is entitled to reject this view and use his massage technique in spiritual counseling.

In order successfully to defend his conduct on free exercise grounds, however, Wolfe must show that this assertion rests upon a religious foundation; if his choice to use massage is, instead, philosophical or personal, it does not warrant free exercise protection. *See Wisconsin v. Yoder, supra.*

The trial court found, as a matter of law, that Wolfe posited no religious basis for his massage technique. I agree.

According to the record, even though he claimed that he could not remember using massage on the minor plaintiff, Wolfe explained that he used massage to assist his counselees in communicating their problems to him so he could help them. Since he believed human touch to be one of the best methods of communication between people, he chose this type of massage to help counselees relax and, consequently, communicate more freely *with him.*

Thus, although his ultimate goal in spiritual counseling was for counselees to receive help from God in resolving their problems, by Wolfe's own testimony, his choice to use massage with children had no biblical, doctrinal, or spiritual basis, justification, or underpinning. Despite the religious setting, the described massage technique simply reflects Wolfe's choice of a relaxation and communication method between himself and his counselees.

### 2.

Furthermore, even if Wolfe's conduct was a religious practice, the free exercise clause is inapplicable because the jury, by its verdicts against him, necessarily found that Wolfe's belief in the use of massage as a beneficial counseling technique was not sincerely held. In other words, the jury determined that Wolfe used massage for personal gratification and not for the spiritual benefit of his counselees, therefore, that the jury was not instructed to consider whether his con-

duct was part of a religious belief is immaterial.

The jury was instructed that, in order to find for plaintiffs on the breach of fiduciary duty claim, it must find that Wolfe was acting as a fiduciary. It was further instructed that "[o]ne who is acting as a fiduciary must act with the utmost good faith and loyalty on behalf of, and for the benefit of that person."

Wolfe asserted that he used massage so that the counselees could receive more effective assistance with their problems. The jury, however, found that as to the minor plaintiff, Wolfe did not act with utmost good faith and loyalty, thus rejecting the premise that Wolfe sincerely believed massage would benefit the counselees. In fact, the jury specifically found that, when committing the offending acts, Wolfe was acting outside the scope of his employment as a pastoral counselor.

Similarly, the verdict against Wolfe on the outrageous conduct claim required a specific finding by the jury that Wolfe engaged in intentional or reckless behavior causing severe emotional distress. Such a finding also is irreconcilable with his assertion that he sincerely believed massage would improve the counseling experience.

### B.

Finally, even assuming, *arguendo,* that Wolfe's behavior was based on a sincerely held religious belief, I do not agree that his otherwise tortious conduct is entitled to First Amendment protection.

The possession and enjoyment of all constitutional rights are subject to reasonable state restriction essential to safety, health, peace, good order, and the equal enjoyment of the same rights by others. *Jacobson v. Massachusetts,* 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905). When children are involved, the state's authority is quite broad. *Prince v. Massachusetts,* 321 U.S. 158, 169, 64 S.Ct. 438, 443, 88 L.Ed. 645, 654 (1944) (child labor is within the state's power to regulate "whether against the parent's claim to control of the child or one that religious scruples dictate contrary action").

Conduct which poses a substantial threat to public safety, peace, or order is within the state's power to proscribe, even if it is in accord with the actor's personal religious convictions. And, when weighed against the actor's First Amendment rights, the balance will tilt in favor of the state's interest in controlling such conduct. *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *see also Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1879).

Accordingly, free exercise protection stops where infringement on the rights of other, non-consenting persons, begins. *See Erickson v. Christenson,* 99 Or.App. 104, 781 P.2d 383 (1989) (claims against pastor for intentional infliction of emotional distress and breach of confidential relationship not barred by First Amendment); *Van Schaick v. Church of Scientology,* 535 F.Supp. 1125 (D.Mass.1982) (First Amendment provided no defense to claim of intentional infliction of emotional distress for activities conducted against former member); *cf. Lawson v. Commonwealth,* 291 Ky. 437, 164 S.W.2d 972 (1942) (free exercise clause does not preclude state from prohibiting religious practice that endangers participants or others).

Thus, even a traditional practice, such as "laying on of hands" to heal or to communicate with God, could amount to an offensive or harmful touch and constitute an intentional tort if used on a non-consenting individual who held strong objections to that technique. *See CJI–Civ.3d 20:5* (1989) (elements of battery). The First Amendment would not provide protection from liability for any harm the touch might have caused.

In contrast, religious practices which do not interfere with the rights or interests of others may not be prohibited or punished merely because they are different from that of the majority. *See Wisconsin v. Yoder, supra* (Amish tradition of discontinuing formal education after eighth grade); *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (refusal to accept employment requiring active participation in the direct production of armaments); *Sherbert v. Verner, supra* (refusal to accept employment requiring work on Saturdays); *cf.*

*Watson v. Jones,* 80 U.S. 679, 13 Wall. 679, 20 L.Ed. 666 (1871) (The full and free right to practice any religious principle, which does not infringe on personal rights, is accorded to all persons). *See* 42 U.S.C. § 2000bb (1993) (the compelling state interest test as adopted in *Sherbert v. Verner* reestablished by the Religious Freedom Restoration Act).

Similarly, a religious practice which would otherwise constitute an intentional tort may receive First Amendment protection if performed upon a member of the same religious society, because the offended member expressly or impliedly has· consented to the society's doctrines and practices and, thus, arguably, to the conduct in question.

Consent is a defense that essentially nullifies a claim of intentional tort; one cannot simultaneously consent to and complain of the same act. *See* Restatement (Second) of Torts § 892 (1977); *People ex rel. City of Arvada v. Nissen,* 650 P.2d 547 (Colo.1982). All persons voluntarily united in membership in a religious society impliedly consent and submit themselves to its ecclesiastical decisions; this consent would be meaningless if the members could appeal to the secular courts for redress from such decisions. *Watson v. Jones, supra.*

Accordingly, for example, "laying on of hands" may be protected if the party distressed by it was a member of a group that practiced that technique as part of religious worship and thus necessarily was aware of, and might expect that, the touch would occur.

In this case, however, I perceive no consent to the offending conduct. At the time Wolfe began counseling, the minor plaintiff did not have the capacity to consent to improper sexual conduct as a matter of law. *See* W. Keeton, *Prosser & Keeton on Torts,* § 18 (5th Ed.1984); *Commonwealth v. Nickerson,* 87 Mass. (5 Allen) 518 (1863); *cf. Prince v. Massachusetts, supra.* Nor was there any evidence to suggest that the minor unreasonably subjected himself to the risk of harm.

I do not view *Destefano v. Grabrian, supra,* as altering this relationship between intentional torts and religious practices. Al-

though the court there explained that, because the conduct of the defendant priest was clearly outside of the beliefs and practices of the Catholic church, no First Amendment questions were raised, it did not determine that constitutional protection attaches *anytime* a cleric defendant asserts that his or her conduct is dictated by a sincerely held religious belief or is consistent with the practice of religion.

Hence, as a matter of law, I would hold that if, as here, significant harm is done to a nonconsenting minor, the offending acts are not protected by the First Amendment simply because they are committed in the name of religion.

## II.

### Expert Witnesses

I also do not agree with the majority's conclusion that plaintiffs' expert witnesses impermissibly testified regarding a professional standard of care.

A claim may be maintained against a member of the clergy for breach of fiduciary duty. *See Moses v. Diocese of Colorado,* 863 P.2d 310, 323 (Colo.1993) ("Once a member of the clergy accepts the parishioner's trust and accepts the role of counselor, a duty exists to act with the utmost good faith for the benefit of the parishioner."); *Destefano v. Grabrian, supra.* Defendants do not dispute that Wolfe was acting as a fiduciary towards plaintiffs.

The duty required by a fiduciary is not tantamount to a "professional standard" of care such as that imposed on a physician or attorney or other specialist. Rather, it imposes an "external standard of a [person] of ordinary prudence in dealing with his own [interests]." *See* Restatement (Second) of Trusts § 174, comment a (1959). Such standard of ordinary prudence will apply, for example, in the context of a parent's duty to his or her child, a trust officer's duty to a trust, or partners' duties to each other in the course of partnership business.

Simply stated, a fiduciary's duty is always to take the more prudent course of action. *See In re Petition of First Interstate Bank,* 767 P.2d 792 (Colo.App.1988). Thus, the testimony of the plaintiffs' witnesses was unquestionably relevant to the question whether Wolfe acted with the ordinary prudence required of a fiduciary when he counseled the minor. Plaintiffs' witnesses gave their opinion that Wolfe's conduct was imprudent and, more particularly, inappropriate, unadvisable, risky, confusing, and harmful.

Nor does the fact the experts also discussed the nature of pastoral counseling transform their opinion into an evaluation of Wolfe's conduct as a "professional standard" of care. The testimony merely placed the issue in context.

Except for Wolfe's use of massage, the content of the counseling sessions was not in issue. Rather, the expert testimony related to the nature of the harm incurred by the minor because of Wolfe's position of trust arising from the pastoral counseling relationship and the intimate, if not overtly sexual, aspects of the massage technique used. The expert testimony was not a commentary on Wolfe's religion and did not require the jury to consider whether his religious beliefs and practices conformed to a standard of competence within the pastoral community.

Moreover, by using his massage techniques on children, Wolfe disregarded the generally held societal view that children should not be touched in that manner. Thus, his actions were subject to an intentional tort action apart from any standard of professional, clerical, care. *Cf. CJI-Civ.3d* 15:12 (1989) (action against physician for battery based upon treatment or operations without consent is a claim separate from malpractice or lack of informed consent).

Thus, that this conduct also might be characterized by some as violative of a professional standard of care is immaterial and does not abrogate the jury's findings. The question of professional standards of care was not before the jurors, nor were they instructed in any way that would have required them to consider a professional standard of care.

Finally, I do not agree that the jury instruction regarding breach of fiduciary duty is so lacking in guidance as to require reversal. The jury was sufficiently informed that

Wolfe's conduct was, by its very nature, imprudent, inappropriate, and carried a risk of harm to the minor, and it was entitled to conclude that it represented a breach of fiduciary duty.

## III.

### *Damages*

I also do not agree that the damages awarded by the jury were duplicative or inherently inconsistent.

In the majority's view, the separate jury awards for the breach of fiduciary duty claim and the outrageous conduct claim are duplicative because the jury was authorized to award damages under each alternative claim for the same injury and it is not possible to determine what losses the separate awards were intended to compensate. I do not agree, however, that the different claims merely represent alternative legal theories which seek recovery for the same, indivisible, injury.

The plaintiffs claimed that the minor suffered injuries as result of improper touching amounting to outrageous conduct, and their expert witnesses testified as to the emotional harm which can occur from such touching by a cleric. In addition, the plaintiffs claimed that the minor suffered injuries as a result of a breach of fiduciary duty and their expert witnesses also testified as to the emotional harm which occurs when the position of trust accorded a cleric during a pastoral counseling relationship is abused. Thus, the jury could have determined that additional emotional or other harm occurred because of this breach of trust beyond that which had occurred because of the improper touching.

Moreover, the jury was specifically instructed not to award damages more than once for the same injuries. Each of the verdict forms also directed it to award the damages it found were caused by each defendants' actions under that particular claim for relief and not to award any damages awarded under any other claim. The jury must be presumed to have understood and followed the court's instructions. *Schmutz v. Bolles*, 800 P.2d 1307 (Colo.1990).

The majority also concludes that the award against the church on the negligent hiring or supervision claim, because based upon the acts of Wolfe, is duplicative of the award against Wolfe. The majority reasons that the church may not be liable for any additional harm to plaintiff beyond that which is already represented by the awards against Wolfe. Again, I disagree.

The basis of an employer's liability for the negligent supervision or hiring of an unfit employee is entirely separate from the basis of liability under the doctrine of *respondeat superior*. And, in a claim of negligent hiring or supervision, there is an important distinction between the scope of an employer's liability as opposed to the measure of damages which result from the employer's conduct.

In determining liability, an employer is liable for harm "only to the extent that the harm is caused by the quality of the employee which the employer had reason to suppose would be likely to cause harm." Restatement (Second) of Agency § 213 comment d (1958) (emphasis added). For example, if Wolfe had harmed plaintiffs by hitting them with his car on his way out of the church parking lot after a counseling session, the church could not be liable for negligent hiring or supervision based upon the information they possessed concerning his counseling technique.

However, this criterion for determining if liability should be imposed upon the church for negligently hiring and supervising Wolfe is completely irrelevant to whether damages caused by this negligence may be awarded in addition to those which were directly caused by Wolfe. In that regard, the jury was directed not to award damages already awarded under any other claim for relief and to enter damages of "zero," should it find that plaintiff already had been fully compensated for this harm. Again, we must presume that the jury followed these instructions.

Finally, because neither party objected to the verdict forms, and the issue has not been raised on appeal, I would not dissect the verdicts for possible inconsistencies. *See Wilson v. Board of County Commissioners*, 703 P.2d 1257 (Colo.1985); *Mt. Emmons*

*Mining Co. v. Town of Crested Butte,* 690 P.2d 231 (Colo.1984); *see also Lee's Mobile Wash v. Campbell,* 853 P.2d 1140 (Colo.1993).

## IV.

As to plaintiffs' cross-appeal, I agree with the majority that no basis existed to assert contributory negligence by the minor plaintiff as to the negligent hiring and supervision claim. I would modify the judgment accordingly, and, as modified, I would affirm the judgment.